UNITED STATES of America, Plaintiff-Appellant,

v.

Wilburn E. PAYNE, Defendant-Appellee.

No. 78–3735.

United States Court of Appeals, Fifth Circuit.

Sept. 24, 1979.

Rehearing and Rehearing En Banc Denied Oct. 22, 1979.

---

Richard Nettum, Asst. U. S. Atty., Macon, Ga., for plaintiff-appellant.

Harry Jay Altman, II, Thomasville, Ga., for defendant-appellee.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

This appeal presents the question whether "check kiting"[1] violates 18 U.S.C. § 1014. We hold that it does. After a hearing in which the government proffered detailed proof of what its evidence would show if the case were allowed to go to trial, the district court dismissed the indictment on the ground that check kiting does not violate 18 U.S.C. § 1014. We reverse.

## I.

Section 1014 of Title 18 U.S.C. in pertinent part provides:

> Whoever knowingly makes any false statement or . . . willfully overvalues any . . . property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation [FDIC] . . . upon any . . . advance . . . or loan . . . or extension of the same . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

Section 1005 of Title 18 provides that it is an offense against the United States to make and cause to be made false entries in the books, reports, and records of certain banks with the intent to deceive the officers of such banks. Count one of the indictment charges that Wilburn E. Payne, the defendant-appellee, conspired with certain others, in violation of §§ 1014 and 1005, wilfully to overvalue securities for the purpose of influencing the actions of banks, insured by the Federal Deposit Insurance Corporation (FDIC), to make advances and extension of credit. Eight substantive counts allege the details of the check kiting scheme.

Payne operated the South Georgia Auto Auction, Inc., a dealer's used car auction in Valdosta, Georgia. He kept the company's business account at the Toney Brothers Bank in Doerun, Georgia. Booker T. Fountain, the co-conspirator, operated a used car business in Berrien County, Georgia, in the town of Nashville. Fountain had two companies, sole proprietorships, Northside Motors and Berrien Auto Sales, which had company checking accounts at the Bank of Alapaha, Nashville, Georgia.

On October 1, 1977, the Bank of Alapaha informed Fountain that it would no longer

---

1. "Check kiting" as used here does not refer just to drawing of checks against uncollected funds, but means the "getting of money or credit by using bad checks," that is the "use of a bad check or similar fictitious worthless commercial paper . . . to raise money or maintain credit temporarily." Webster's New World Dictionary 778 (2d college ed. (1972).

give him immediate credit on sight drafts presented for collection in operating his used car business. It would continue to give immediate credit for checks deposited in the bank. Fountain then went to Payne and informed him of his problem. The two agreed to exchange checks. Fountain would sell an automobile to himself through Payne's company, South Georgia Auto Auction, Inc., and as the buyer pay for it with a check to the company. South Georgia Auction would then issue a corresponding company check to Fountain as the seller of the automobile after deducting $40 as an auction fee.

The sales Fountain made to himself through Payne's company were fictitious. The automobiles did not exist. Indeed, during December 1977 and January 1978 Fountain sold to himself the same non-existent automobile seven or eight times a week. These fictitious sales were all recorded on the books of South Georgia Auto Auction and, of course, Payne knew that the sales were fictitious. After an exchange of checks, each would deposit in his bank the other's check. Fountain put the South Georgia Auto Auction checks into his account at the Bank of Alapaha. Payne would deposit Fountain's checks in the South Georgia Auto Auction account at the Toney Brothers Bank.

The scheme operated successfully from October 1, 1977 through January 1978. Fountain used the immediate credit he received from the Bank of Alapaha to operate his business. Payne used the funds from the kite to operate his business. In some instances Payne gave Fountain checks drawn on the account of South Georgia Auction when the account was overdrawn $40,000 to $50,000; on one occasion, by $100,000. When a Georgia State bank examiner spotted the kite and put an end to the scheme, the Bank of Alapaha was left with $178,000 in worthless checks.

The district court issued a brief order dismissing the indictment because counts two through nine did "not state facts sufficient to constitute an offense against the United States"; that therefore the "facts

alleged in count one would not constitute a conspiracy to violate the laws of the United States".

## II.

On appeal, the government argues that a check is a security within the meaning of the statute. Each time one of the checks in the kite was presented to a bank, the defendant was misrepresenting the value of the check. The bank's giving of immediate credit on the deposit of each check constituted an extension of credit or a loan or an advance. The presentation of worthless checks to a bank, therefore, is a transaction intended by Congress to be covered by the statute. We agree with this argument. We note that this case does not involve an isolated transaction in which a bank account is, in good faith, overdrawn. Here we have an extended series of transactions involving the extension of credit based on the defendant's willful misrepresentation.

A. The defendant's argument on appeal is essentially the same as the reasoning articulated in *United States v. Edwards,* M.D.Pa.1978, 455 F.Supp. 1354. *Edwards* appears to be the only case directly in point. The facts are indistinguishable from the facts here presented, except that the kite here was a two-man kite.

The key language in *Edwards,* on which the defendant relies is as follows:

presenting a check to a federally insured bank is not a "statement" which can be rendered false by the fact that the drawer of the check does not possess sufficient funds to cover the instrument but is an order to the drawee bank to pay the instrument according to its terms. . .

· · · · ·

. . . a check itself is not the type of statement which can be true or false. [Defendant] contends that a check is simply a direction to a bank to pay the instrument according to its terms. A direction can be neither true nor false. The Uniform Commercial Code defines a check as a draft drawn on a bank, pay-

able on demand, payable to either order or bearer, signed by the drawer and containing an unconditional promise to pay a sum certain. [109A–3–104]. As such, if a check is no more than a promise to pay, it cannot be true or false.

455 F.Supp. at 1356.

There has never been any doubt that a check is a "direction to a bank to pay" or that a check is "a promise to pay". But this over-simplified description of a check is not inconsistent with the necessary implications a check carries. "In giving a check, the drawer impliedly represents that he has on deposit with the drawee banks funds equivalent to the face amount of the check." Whitney, The Law of Modern Commercial Practices, § 341 (1965). If payment of the check depends on the deposit of the check of another, the necessary implication is that the other's check will be paid from an account having funds at least equivalent to the face amount of the check. We consider that the necessary implications which a check carries, and of which Payne and Fountain were fully aware, are the legal equivalent of a representation or statement as to the value of the checks. Here, we are not dealing with a man careless in balancing his check-book. We have here two business men who contrived a kiting scheme that would have the effect of giving them *credit* or a *loan* or an *advance* on their false representation of the value of their checks. It is unnecessary to belabor the point that a check is more than a simple "order or direction". All states have "bad check" laws based on the concept that giving a kited check is a form of fraud and misrepresentation. *See,* for example, Ga.Code Ann. 26–1704.

B. The language of 18 U.S.C. 1014 is not a barrier to prosecution in this case. A check is a "security". In 18 U.S.C. § 2311, relating to stolen property, "security" is specifically defined to include "any . . . check". In *United States v. Huntley,* 5 Cir. 1976, 535 F.2d 1400, 1403, this Court held that "checks fall within the broader class of 'falsely made' *securities* whose interstate transportation is forbidden by § 2314". The

Uniform Commercial Code states: "A bank has a security interest in . . . an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied . . . . [and] if it makes an advance on or against the item" Ga.Code Ann. 109A–4–208(1)(a) and (c).

C. To fall within 18 U.S.C. § 1014 the overvaluation must be "for the purpose of influencing in any way the action of . . . any bank . . . upon any . . . advance, . . . or loan". The essence of check kiting is the obtaining of credit in the nature of an advance or loan, however it may be characterized.

In *United States v. Western Contract Corp.,* 8 Cir. 1965, 341 F.2d 383, 386, the court concluded:

" 'It is our opinion that although the extension of credit or the allowance of the privilege of writing checks before final clearance of the deposited check is not a formal loan evidenced by a note with agreed interest and possibly some collateral, it is a transaction in the nature of a loan, perhaps more properly termed an advance of money.' "

In *Universal C.I.T. Corp. v. Guarantee Bank and Trust Co.,* D.C.Mass.1958, 161 F.Supp. 790, 793, the court went further:

"Where the bank allows a customer to draw against an uncollected item, particularly in the face of a contract recognizing that the depositor has no right to demand such a privilege, both parties would ordinarily view this allowance not as an unsecured loan upon the customer's general credit but as a bank loan buttressed by the security of the uncollected item."

And, as noted, the Uniform Commercial Code gives a bank a security interest in a deposited item, if an advance has been made against the item. Ga.Code Ann. 109A–4–208(1)(c).

Other courts prefer to characterize check kiting "as a scheme whereby false credit is obtained by the exchange and passing of worthless checks between two banks". *Falconi v. Federal Deposit Insurance Corp.,* 3 Cir. 1958, 257 F.2d 287, 289. In *Fidelity and*

*Casualty Company of New York v. Bank of Altenburg,* 8 Cir. 1954, 216 F.2d 294, 302–303, the court declined to characterize the advance of money pursuant to a check kite scheme as a loan, but said:

> "Check kiting, as practiced here, involves more than the mere use of a check with insufficient funds in the bank to meet it. It involves a series of acts which taken together constitute a scheme, a studied device, false pretenses built upon a series of false representations designed to lull the bank involved into a feeling of confidence and security. A bad check is given. Money or credit is received from a bank other than the one on which the check is drawn. If credit is taken, that credit is usually drawn on immediately. The check kiter then deposits a check in the bank upon which the first check is drawn before the first check arrives there. The second check is drawn on the bank from which the first money or credit is received. Credit is taken for it and that credit covers the first check when it comes in and possibly additional credit. Then the process is carried on, back and forth, until the scheme is discovered."

In short, check kiting, as engaged in by Payne and Fountain, was a device for fraudulently obtaining credit sufficiently in the nature of an advance or loan to come within the scope of 18 U.S.C. § 1014.

### III.

The legislative history is meager. In the 1948 codification of Title 18, Section 1014 reduced to a single section thirteen existing statutes.[2] Act of June 25, 1948, c. 645, 62 Stat. 752. Most of these statutes dealt with false statements in connection with farming and loans from such agencies as the Farm Credit Administration, the Federal Crop Insurance Corporation, the Farmers' Home Corporation, and the Federal Home Loan Bank. Two of the statutes, however, involved federal agencies that were not limited to lending for farm or home construc-

tion: Federal Reserve Banks (former 12 U.S.C. § 596) and the Reconstruction Finance Corporation (15 U.S.C. § 616(a)). The revisor's notes state that the enumeration of "application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment or loan" does not occur in any one of the thirteen predecessor sections, but that the enumeration represents a composite of terms and transactions mentioned somewhere in each section. Later additions, deletions, and amendments occurred from 1949 through 1970. The most extensive changes were made in 1970 with the addition to the statute's coverage of the Federal Deposit Insurance Corporation, FDIC insured banks, the Federal Savings and Loan Insurance Corporation, FSLIC insured institutions, members of the Federal Home Loan Bank System, and the Administrator for the National Credit Union Administration. Thus, by 1970 the codified section was not devoted exclusively to criminal coverage for false applications in the farming and home construction field. *See, e. g., United States v. Sabatino,* 2 Cir. 1973, 485 F.2d 540, 543.

This development leads us to the inference, contrary to the court's conclusions in *Edwards,* that the intent of Congress was to incorporate in one codal section all of the business transactions of any of the specified agencies. The statute therefore proscribes not only fraudulent statements given in connection with farm or construction loan but "all undertaking[s] which might subject the FDIC insured bank to risk of loss". *United States v. Stoddart,* 10 Cir. 1978, 574 F.2d 1050, 1053.

█ Payne and Fountain successfully managed a kite for four months with a float that rose to $178,000. They obtained that credit, advance, loan, only by falsely representing the worthless checks as worth their face value. 18 U.S.C. § 1014 makes their misrepresentation a federal offense when the injured bank is insured by the FDIC.

REVERSED.

---

**2.** 7 U.S.C. §§ 1026(a) and 1514(a); 12 U.S.C. §§ 596, 981, 1123, 1138d(a), 1248, 1312, 1313, 1441(a), and 1467(a); and 15 U.S.C. § 616(a).