UNITED STATES of America, Plaintiff,

v.

Andrew D. PAVLICK, Defendant.

Crim. No. 80–00105.

United States District Court,
M. D. Pennsylvania.

Dec. 16, 1980.

Robert Nolan, Asst. U.S. Atty., and Carlon O'Malley, U.S. Atty., Scranton, Pa., for plaintiff.

Charles P. Gelso and John P. Moses, Wilkes Barre, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. INTRODUCTION

This case comes before the court on a motion by the defendant to dismiss the indictment.[1] The underlying action arose from a "check-kiting" scheme that Pavlick allegedly carried out at the expense of the Susquehanna Savings Association ("Susquehanna") and the First Eastern Bank ("Eastern"). According to the Government, the defendant opened various accounts in each institution and then managed his money in an illegal manner.

The factual background as developed from the indictment and discussions during two pretrial conferences reveals that over a seven-day period in September 1979, Pavlick allegedly presented to Susquehanna twenty-two checks drawn on his accounts in Eastern. The Government contends that the defendant knew all these checks to be "overvalued," because he did not have sufficient deposits in Eastern to cover them. Indeed, the "funds" that had ostensibly been deposited in Eastern to pay for the twenty-two checks consisted of an earlier set of worthless checks issued by Susquehanna.[2] Significantly, the indictment alleg-

---

1. Strictly speaking, the instant motion attempts to overturn a superseding indictment. The Grand Jury submitted its first set of accusations against Pavlick on September 26, 1980. Those charges were preempted by a second indictment filed on the subsequent November 13th.

2. The indictment does not allege exactly how long Pavlick had juggled his deposits between Susquehanna and Eastern to maintain artificially high balances in his various accounts. At oral argument, however, the Government asserted that the scheme may have lasted as much as four years.

es that Pavlick's goal was to receive from Susquehanna "funds" in the face amount of each check.[3]

The charges against the defendant consist of twenty-six separate counts. The Government feels that each of the "overvalued" checks presented to Susquehanna constituted a violation of 18 U.S.C. § 1014, which protects designated institutions from specific types of fraud.[4] The initial twenty-two counts of the indictment each cite one of the checks as a transgression of § 1014. The remaining four accusations concern 18 U.S.C. § 2113(a), a statute which makes it a crime to enter certain financial entities with the intent to commit a felony.[5] Pavlick did not present the twenty-two "overvalued" checks to Susquehanna in one transaction. Rather, the Government maintains that the defendant submitted a number of the checks on four different occasions.[6] Counts 23–26 each label one of these instances as a separate violation of § 2113(a).

Pavlick argues that the "check-kiting" scheme portrayed by the indictment does not controvert § 1014. If this contention is correct, the entire action must be terminated. Acceptance of the defendant's theory would invalidate the twenty-two counts which explicitly allege transgressions of § 1014 and nullify the remaining allegations, since there would be no underlying felony necessary for a prosecution under § 2113(a).[7] An analysis of the situation indicates that Pavlick's construction of the two statutes at issue is correct. Consequently, the court shall dismiss the indictment.

3. *See* Document 16 of the Record at 2. The indictment does not explain how the defendant disposed of the checks presented to Susquehanna. At oral argument, the Government stated that over the years of the kite Susquehanna initially cashed Pavlick's checks but later on, when the amount of Eastern checks became higher, exchanged Susquehanna checks for those the defendant submitted.

4. The full text of § 1014 reads:
Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the Reconstruction Finance Corporation, Farm Credit Administration, Federal Crop Insurance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, any Federal intermediate corporation organized under sections 1131–1134m of Title 12, or of any regional agricultural credit corporation established pursuant to law, or of the National Agricultural Credit Corporation, a Federal Home Loan Bank, the Federal Home Loan Bank Board, the Home Owners' Loan Corporation, a Federal Savings and Loan Association, a Federal land bank, a joint-stock land bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, any member of the Federal Home Loan Bank System, the Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, or the Administrator of the National Credit Union Administration, upon any application, advance, discount, purchase, purchase agreement, re-purchase agreement, commitment, or loan, or any change or extension of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

5. Section 2113(a) reads in relevant part:
Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—
Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

6. The indictment names the following dates in September 1979: the 13th, 14th, 17th, and 20th. All of these transactions occurred at Susquehanna's office at the Wyoming Valley Mall in Wilkes-Barre.

7. As quoted in n.5, *supra*, the separate felony must either violate a "statute of the United States" or constitute "larceny." Neither prerequisite is satisfied if § 1014 does not apply.

## II. ALTERNATIVE PRECEDENTS

In essence, the Government's case against the defendant involves two different contentions. First, the indictment asserts that every time Pavlick presented one of the twenty-two fraudulent checks to Susquehanna, he "overvalue[d] a security, said security in each instance being the individual check." [8] As previously noted, the charge that these checks were "overvalued" rests on the assertion that whenever the defendant submitted one of the bogus checks, he falsely represented to Susquehanna that the check in question was fully backed by cash in the relevant Eastern account. Second, the Government insists that the purpose of the scheme was to induce Susquehanna to give Pavlick "funds in the face amount of each check," and that such a grant of funds may be considered as an "advance" of money or a "loan" as those terms are defined by § 1014. On this basis, the indictment concludes that the defendant violated the latter statute which, in pertinent part, provides that: [8]

> Whoever . . . willfully overvalues any . . . security, for the purpose of influencing in any way . . . any institution the accounts of which are insured by the Federal Savings and Loan Corporation . . . [or] any member of the Federal Home Loan Bank system . . . upon any advance . . . or loan shall be fined not more than $5,000 or imprisoned not more than two years, or both.[9]

Pavlick, conversely, places heavy emphasis on *United States v. Edwards*, 455 F.Supp. 1354 (M.D.Pa.1978) (Muir, J.). The facts of that precedent closely resemble those of the current litigation. In *Edwards*, the defendant deposited in The First National Bank of Carbondale fifty checks which were worthless in that the account on which they were drawn did not contain sufficient cash. The Government's theory differed somewhat from that against Pavlick, since the *Edwards* defendant was accused of making a "false statement" (rather than "overvaluing a security") in order to effect a proscribed transaction.[10] For that reason, certain portions of the opinion are inapposite to the current situation, because they key on a question which does not concern this case, *viz.*, whether a bogus check can be a "false statement" within the meaning of § 1014. *See id.* at 1356–57. Nevertheless, the overall logic of *Edwards* clearly supports Pavlick. A fair reading of the opinion indicates that after a thorough review of "the language of the statute and its history," Judge Muir concluded that check-kiting, *per se,* does not violate federal law. The crux of the *Edwards* holding is explained in the following statement: "[H]ad Congress intended to outlaw the passing of worthless checks to . . . banks, it could easily have said so in terms far more certain than those contained in § 1014." *Id.* at 1357.

In an attempt to discredit the defendant's rationale, the Government cites *United States v. Payne*, 602 F.2d 1215 (5th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980). That case concerned a defendant who aided a co-conspirator in defrauding a bank by depositing worthless checks in a business account. The bank then extended the co-conspirator "credit" which the defendant used to operate his business. The exact facts of *Payne* are somewhat obscure since the Court of Appeals did not clearly explain if by "credit" it meant that the schemers received

---

8. *See* document 16 of the Record at 1.

9. The full text of the statute is set out at n.4, *supra*. The defendant does not question the fact that Susquehanna is an appropriate institution for protection under § 1014.

10. Section § 1014 outlaws both false statements and overvaluations designed to facilitate one of the illegal actions. *See* n.4, *supra*.

loans or simply credit for cash deposits.[11] The decision, nonetheless, was definite in its rejection of *Edwards*. Initially, the *Payne* panel endorsed one of the contentions that the Government employs against Pavlick, *i. e.*, that the presentation of a worthless check amounts to the overvaluation of a security. *Id.* at 1218. Furthermore, the opinion contained language suggesting that any consideration the bank gave upon acceptance of the bogus checks would be "sufficiently in the nature of an advance or loan to come within the scope of 18 U.S.C. § 1014." *Id.* at 1218–19. The *Payne* decision, therefore, decided that check-kiting, by itself, amounts to a transgression of federal law.

After reviewing the relevant authorities, this court concludes that the requirements for a violation of the statute turn not on the method of the scheme, but on its purpose. For reasons that shall be explained, a check-kite may well flout § 1014 if the kiter's goal is the receipt of consumer or commercial credit from a protected institution. Yet the court is also convinced that Judge Muir was correct when he stated in *Edwards* that Congress has not passed a blanket prohibition against check-kiting. Pavlick stands accused of passing worthless checks to Susquehanna in order to receive funds "in the face amount of each check." Even if the defendant did in fact commit this fraud, he did not violate § 1014.

## III. ANALYSIS OF THE STATUTE

Section 1014 does not outlaw all attempts to swindle the various entities that the pro-vision was framed to safeguard. The enactment only criminalizes misrepresentations which attempt "to influence action by the financial institution concerning a *loan* or *other transaction listed in the statute.*" *United States v. Erskine*, 588 F.2d 721, 722 (9th Cir. 1978) (emphasis added). Three factors demonstrate that check-kiting, without more, does not fall within a category of proscribed acts: (1) the structure and language of § 1014, (2) the legislative history, and (3) the relevant case law.

As previously indicated, nothing in the statute makes a direct reference to check-kiting or related schemes. The indictment can only stand if Susquehanna's alleged extension of funds to Pavlick can be defined as an "advance," "commitment," "loan," or one of the other broad terms in § 1014. The Supreme Court has declared that in assessing such questions, the correct approach is to interpret the law as a "whole" and not to give undue emphasis to "general words" which, if construed literally, would extend the sweep of the provision beyond the objectives of Congress. *Stafford v. Briggs*, 444 U.S. 527, 535–36, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980). According to its title, § 1014 regulates: "Loan and credit applications generally; renewals and discounts; crop insurance." The statute, moreover, is but one of a series of laws that relate to rather specific crimes, especially offenses against federally-affiliated lenders.[12] Consequently, the indictment can only be sustained if the court accepts the argument that Congress intended to outlaw a substantial offense, such as check-kiting, by a statute which, when viewed as a whole, merely seems to concern misrepresentation in the fields of commercial and

---

11. The distinction is potentially important, because only in the latter case would the precedent be truly analogous to *Edwards* or the instant case.

12. *See, e. g.*, 18 U.S.C. § 1010 (outlaws fraud in loans that concern the Department of Housing and Urban Development); 18 U.S.C. § 1011 (criminalizes dishonesty in federal land bank mortgages); 18 U.S.C. § 1013 (proscribes improprieties with regard to farm loan bonds and credit bank debentures).

consumer credit. Such a conclusion is tenuous.

■ Two other rules of construction support Pavlick. First, as Judge Muir stated in *Edwards,* any genuine ambiguity in a criminal law must be resolved in favor of the defendant. 455 F.Supp. at 1356. *See also Perrin v. United States,* 444 U.S. 32, 49 n.13, 100 S.Ct. 311, 317 n.13, 62 L.Ed.2d 199 (1979); *United States v. Culbert,* 435 U.S. 371, 379, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978). The judiciary, moreover, may not presume that an enactment intends to expand federal criminal jurisdiction into previously unregulated areas, *e. g.,* check-kiting. Any such increase in scope must be "clearly expressed." *United States v. Sabatino,* 485 F.2d 540, 543 (2d Cir. 1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974). *See also United States v. Edwards,* 455 F.Supp. at 1357. Thus, in light of the fact that the language and structure of § 1014 are at best ambiguous on the question of check-kiting, the court could not sanction the indictment unless the Government demonstrated convincing support for its position in the legislative history of the statute.

■ The exact Congressional intent behind § 1014 is not easy to discern, because the provision is the culmination of many earlier enactments. One conclusion, however, is certain: the main purpose of the statute and its predecessors has always been to protect lending institutions whose activities are important to federal policy. During the earlier part of this century, Congress passed several laws criminalizing misrepresentation in loan requests to various agencies of the United States which dispensed credit. The designated entities included the Reconstruction Finance Corporation and certain institutions of the New Deal. *See* Annot., 16 ALR Fed. 827 § 1 n.3 (1973). In 1948, a number of these provisions were consolidated in 18 U.S.C. § 1014. The list of protected agencies has been increased on a number of occasions.

Unfortunately, the Committee Reports discussing § 1014 are rather sparse. The information that does exist, however, supports the proposition that the statute does not concern check-kiting. In 1970, for example, Congress considered a bill to provide insurance for certain accounts in credit unions chartered by either the state or federal authorities. In recommending the measure, the Banking and Currency Committee of the House of Representatives suggested that, as a companion action, credit unions authorized by the states be included among the institutions safeguarded by § 1014. Significantly, the Report explained that the latter provision concerned "false statements in loan and credit applications." [1970] U.S. Code & Admin.News 4166, 4187. During that same year, the House Banking and Currency Committee acted favorably on another extension in the scope of § 1014. Specifically, the reform placed the Federal Savings and Loan Insurance Corporation, all banks insured by the Federal Deposit Insurance Corporation, and a number of other entities within the protection of the provision. The Report said that § 1014 provided "penalties for making false statements in connection with loans or other *similar* transactions." [1970] U.S.Code & Admin.News 5582, 5617 (emphasis added).

Perhaps the most extensive Congressional treatment of the statute occurred in 1964, when the Senate Banking and Currency Committee described a bill which in part listed federal credit unions among the safeguarded agencies. The Report noted that § 1014 was "designed primarily to apply to borrowers from federal agencies or federally chartered organizations." Other individuals could violate the law, such as "officers," or "employees" of the designated entities. The Report, however, did not even hint that the enactment covered non-credit transactions. On the contrary, the Committee noted that the laws of the states supplemented federal protection and applied to various "thefts of one kind or another" that

might befall any financial institution. The Report stated that while a massive overhaul of criminal law protecting lending institutions was not contemplated, it would be:

appropriate to include Federal credit unions within section 1014, in order to provide additional protection to Federal credit unions against false statements or reports or willful overvaluations of land, property, or security in connection with applications for loans, etc. The availability of this section would not, of course, preclude the appropriate authorities from taking action under other applicable sections of the United States Code or under applicable State statutes.

[1964] U.S.Code & Admin.News 2519, 2522–23. (emphasis added).

In short, review of the legislative history vindicates the *Edwards* interpretation of § 1014. The statute simply criminalizes fraud in credit transactions. Congress never intended that the measure reach schemes such as check-kiting, which remain within the exclusive jurisdiction of the states. Accordingly, the Government is incorrect in asserting that the indictment charges Pavlick with a violation of federal law.

Finally, the defendant's interpretation of § 1014 coincides with most of the cases that have interpreted the statute. In *United States v. Simmons*, 503 F.2d 831, 835 (5th Cir. 1974), the Court of Appeals for the Fifth Circuit stated the following:

In order to meet its burden of proof, in *any* prosecution pursuant to Title 18, U.S.C. Sec. 1014, the government must show (1) that a statement has been supplied by the defendant to a specified lending institution which is capable of influencing the institution's decision *to loan funds*, and (2) that the statement is knowingly false. [emphasis added] [13]

According to *United States v. Michael*, 456 F.Supp. 335, 342 (E.D.Pa.1978), *aff'd*, 605

F.2d 1198 (3d Cir. 1978), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 702, 62 L.Ed.2d 667 (1980), § 1014 "punishes the making of a false statement for the purpose of influencing the action of a federally-insured bank on a loan application or renewal." Furthermore, the major precedents that involve the statute have involved swindles in the credit area. *See, e. g., United States v. Cerrito*, 612 F.2d 588 (1st Cir. 1979); *United States v. Norberg*, 612 F.2d 1 (1st Cir. 1979); *United States v. Sackett*, 598 F.2d 739 (2d Cir. 1979); *United States v. Erskine*, 588 F.2d at 721; *United States v. Sue*, 586 F.2d 70 (8th Cir. 1978); *United States v. Scalzitti*, 578 F.2d 507 (3d Cir. 1978); *United States v. Sabatino*, 485 F.2d at 540; *United States v. Goberman*, 458 F.2d 226, (3d Cir. 1972).

It must be conceded that *Payne* is not the only authority that supports the Government. *United States v. Stoddart*, 574 F.2d 1050 (10th Cir. 1978) concerned a defendant who telephoned his bank and stated that he had recently deposited $1,500.00 in his checking account. Relying on this representation, the bank paid a $1,390.00 overdraft signed by the defendant. Unfortunately, the $1,500.00 deposit had never been made. In all, the bank suffered a loss of $1,585.74 on the account, and most of the deficit arose from the $1,390.00 overdraft. After a jury trial, the defendant was convicted of "making a false statement to a bank insured by the Federal Deposit Insurance Corporation, FDIC, to influence action by the bank on a commitment, in violation of 18 U.S.C. § 1014." On appeal, the defendant contended that his crime did not fall within the statute. The Court of Appeals for the Tenth Circuit disagreed.

*Stoddart* gave an expansive interpretation to "commitment," one of the protected transactions listed in § 1014. The panel concluded that the term did not simply mean "an agreement to make a loan." On

---

13. *Simmons*, of course, conflicts with the language in *Payne* which suggests that a § 1014 violation may occur even if the lending institution extends cash rather than consumer or commercial credit. The two cases must be

reconciled, because both were rendered by the Fifth Circuit. For the reasons stated in this Memorandum, the court finds the broader language of *Payne* unpersuasive.

the contrary, the Court of Appeals held that "[t]he purpose of § 1014 was to cover all undertakings that might subject the FDIC bank to risk of loss." *Id.* at 1053. On this basis, the conviction was affirmed. In the instant case, Pavlick is certainly accused of subjecting Susquehanna to a "risk of loss." This court, however, disagrees that such an action is enough to transgress the relevant enactment.

Significantly, the *Stoddart* opinion did not bolster its conclusion with convincing authority. The panel admitted that its interpretation of "commitment" had no concrete support in legislative history. Indeed, *Stoddart* derived its definition of the term from Webster's New International Dictionary, 2d ed. (1960). As already explained, this court believes that the structure and history of the statute limit the scope of § 1014 to situations in which a protected institution considers an extension of commercial or consumer credit. Therefore, with all due respect, *Stoddart* shall not be applied.[14]

## IV. CONCLUSION

■ This decision must be placed in the proper perspective. Check-kiting is a serious fraud which clearly violates federal law when effected through the mails. 18 U.S.C. § 1341. *Falconi v. Federal Deposit Insurance Corporation*, 257 F.2d 287, 291 (3d Cir. 1958). The court, moreover, has little doubt that a kite would transgress § 1014 if it were in some way intended to convince a protected institution to extend credit to the schemer.[15] Yet absent special circumstances, Congress has decided to leave the policing of such activity to the states. Accordingly, any prosecution of Pavlick should be initiated by the Commonwealth in the Luzerne County Court of Common Pleas. In any event, the instant indictment must be dismissed.

---

14. In the view of the Government, *United States v. Matsinger*, 191 F.2d 1014 (3d Cir. 1951) suggests that any consideration given for the twenty-two bogus checks may be characterized as an "advance," as the term is employed in the statute. That precedent is inapposite. *Matsinger* concerned an individual tried for misuse of bank funds under 12 U.S.C. § 592 (1940). To establish its case, the Government was obligated to prove that the funds in question had been converted to the use of the offender. Our Court of Appeals held that even a temporary conversion would satisfy the statute. Nothing in the opinion, however, states that a payment of cash or its equivalent is a loan. Indeed, *Matsinger* contained language to the contrary. *Id.* at 1018.

Even more importantly, the court is convinced that the transactions covered by § 1014 are limited to commercial or consumer credit. Whether or not a transaction falls within this area is a difficult question. A court must look to a variety of indicia, *e. g.*, whether or not interest is involved. *United States v. Cerrito*, 612 at 590–91. The instant indictment, nevertheless, alleges that Pavlick sought simply a payment of "funds." There is not the slightest suggestion that credit was involved.

15. For example, if the defendant has presented worthless checks to Susquehanna to be held as collateral for a loan, then the Government would have a strong argument that he had overvalued "property" or a "security" in order to carry out a proscribed transaction. *See United States v. Cerrito*, 612 F.2d at 590–91.