UNITED STATES of America,
Plaintiff-Appellee,

v.

William Archie WILLIAMS,
Defendant-Appellant.

No. 80–3064.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 19, 1981.

Rehearing and Rehearing En Banc
Denied April 17, 1981.

William M. Cady, Tom N. Thompson, Shreveport, La., James McPherson, New Orleans, La., Gary G. Grindler, Nickolas P. Chilivis, Randolph A. Rogers, Kenneth G. Menendez, Atlanta, Ga., for defendant-appellant.

Edward L. Shaheen, U. S. Atty., D. H. Perkins, Jr., Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before AINSWORTH, Circuit Judge, KUNZIG, Judge,* and RANDALL, Circuit Judge.

KUNZIG, Judge:

William Archie Williams in 1979 was convicted in federal district court on one count of misapplication of bank funds and two counts of check kiting. He now appeals upon several grounds, principally evidentiary. It is our determination, however, that none of the grounds have merit.

### I

In 1975, appellant William Archie Williams, an experienced businessman from rural Louisiana, purchased the majority interest in the Pelican State Bank, Pelican, Louisiana. He promptly appointed himself bank president. Pelican is a relatively small bank with only $3,000,000 in assets.

For a number of years prior to Williams' assumption of control, Pelican Bank had maintained a so-called "dummy account", an account used to charge items drawn on the bank by customers who had insufficient funds in their individual checking accounts to pay the items. A check would be paid from the bank's general pool of assets and held in the dummy account until the customer had deposited sufficient funds to cover the check. At this point, the check would be posted to the customer's account and the figure for accumulated checks in the dummy account correspondingly reduced. The dummy account statement contained a running balance of overdrafts which at all times equaled the total value of checks held in the dummy account. Also, upon each business day, the dummy account statement would be adjusted to indicate total "deposits" equal to total overdrafts covered as of the close of the previous business day. This was merely an accounting entry designed to reflect the bank's loss of use of the funds which had been applied to paying overdrafts. It seems that the bank charged no interest for providing this service.

It is unclear what, if any, limitations existed upon usage of the dummy account. Suffice it to say that Williams, as controlling shareholder and bank president, apparently enjoyed completely unhindered usage. We are here primarily concerned with the period from December 1977 to May 1978. Between December 20, 1977 and May 2, 1978, Williams drew many personal checks which were paid from the dummy account. By May 2, 1978, total overdrafts attributable to this activity had risen to $58,055.44. This was slightly in excess of 50% of the total overdrafts covered by the dummy account at that time. It is important to note that no other officer of the bank made use of the dummy account during Williams' presidency. Indeed, the bank's board of directors had requested that Williams eliminate the dummy account but he failed to take any action.

On May 8, 1978, state and federal bank examiners arrived at the bank to conduct

---

* Judge of the United States Court of Claims, sitting by designation.

an audit. They rather quickly discovered Williams' heavy drawings upon the dummy account, but did not immediately approach him. Instead, they began discreetly to monitor Williams' personal banking activity during the next few weeks.

On May 8, 1978—the same day as the commencement of the bank examination—Williams opened a personal checking account at Winn State Bank, Winnfield, Louisiana, depositing $4,649.97. The deposit was posted to the account on May 9, 1978.

Also on May 9, 1978, Williams deposited in his personal checking account at Pelican Bank a check for $58,500 drawn upon his checking account at Winn Bank. This sum, of course, far exceeded Williams' actual balance in Winn Bank at the time. Pelican Bank thereupon credited Williams' checking account for the face amount of the deposited check. At the same time, Pelican Bank posted to Williams' checking account the group of checks which Williams had drawn from December 20, 1977 to May 2, 1978 and which had been cleared through the dummy account—$58,055.44 worth. The overdraft balance in the dummy account fell correspondingly. At the start of business on May 9, 1978, Williams' checking account at Pelican Bank showed a balance of $8.33. At the close of business, this figure had risen to $452.89.

On May 10, 1978, Williams deposited in his checking account at Winn Bank a check for $60,000 drawn on his personal checking account at Pelican Bank. Again, this sum far exceeded Williams' true balance in the drawee bank. Winn Bank thereupon credited Williams' checking account for the face amount of the deposited check. At the start of business on May 10, 1978, Williams' checking account at Winn Bank showed a balance of $4,649.97. At the close of business, the balance had increased to $64,-647.12 (a debit of $2.85 also having been recorded that day). As a result, Winn Bank routinely paid Williams' $58,500 check of May 9, given to Pelican Bank on that date, when it cleared for payment on May 12, 1978.

On May 11, 1978, there was presented for payment at Pelican Bank the $60,000 check which Williams had deposited in Winn Bank the day before. Because of insufficient funds in Williams' account, Pelican cleared the check through the dummy account. The overdraft balance in the dummy account rose correspondingly.

On May 16, 1978, Williams deposited in his checking account at Pelican Bank a check for $65,000 drawn upon his combined personal and business checking account at Sabine State Bank, Many, Louisiana. Williams' actual balance in Sabine Bank was only $1,204.81 at the time. Pelican Bank thereupon credited Williams' checking account for the face amount of the deposited check. At the same time, Pelican Bank posted to Williams' checking account the $60,000 check which Williams had deposited in Winn Bank on May 10, 1978 and which had been cleared through the dummy account on May 11, 1978. The overdraft balance in the dummy account fell correspondingly. At the start of business on May 16, 1978, Williams' checking account at Pelican Bank showed a balance of $102.89. At the close of business, the balance had risen to $5,102.89.

Because of insufficient funds in Williams' checking account, Sabine Bank refused to make payment on the $65,000 check when it was presented for payment on May 17, 1978. Pelican Bank charged Williams' account accordingly on May 23, 1978. Williams neutralized the charge-back by depositing a $65,000 money order in his Pelican account the same day. Williams had purchased the money order from Sabine Bank with the proceeds of a real estate mortgage loan which he obtained from Sabine on May 18, 1978. Negotiations for the loan had presumably commenced some time earlier but it is not possible to determine from the record precisely when.

As a result of this intricate banking activity, Williams was able to obtain for his personal account at Pelican Bank interest-free credit of $58,500 from May 9, 1978 to

May 12, 1978 and $65,000 worth from May 16, 1978 to May 23, 1978. Further, he was able to obtain interest-free credit of $60,000 at Winn Bank from May 10, 1978 to May 11, 1978. He was able to do so upon the basis of checks whose face amount uniformly exceeded the amount of funds backing them in his personal account at the drawee bank upon the date when given.

During their audit, lasting approximately two weeks, the bank examiners followed these activities closely. Eventually, they voiced numerous criticisms which culminated in a special meeting on May 26, 1978 in Shreveport between the Pelican board and state and federal banking officials. The state banking commissioner presided. He expressed his concern over the matters which had been brought to his attention and requested that Williams resign as president. Williams did so at once.

The United States Attorney in Shreveport—brought into the case *via* a criminal referral from FDIC—also was alarmed by Williams' conduct and obtained a one-count indictment on September 21, 1979. A superseding three-count indictment was obtained on October 19, 1979.

Count I charged that, "Beginning on . . . December 20, 1977 and continuing . . . to May 9, 1978 . . . William Archie Williams, being an officer . . . of . . . Pelican State Bank . . . a bank the deposits of which are insured by [FDIC] . . . with intent to injure and defraud said insured bank, did willfully and knowingly misapply . . . monies and funds . . . of said bank, in the amount of $58,055.44 . . . by converting to his personal use said sum, all in violation of [18 U.S.C. § 656 (1976)]. . . ." [1] This, of course, referred to Williams' sizable overdrafts during the period in question.

Count II charged that, "On . . . May 9, 1978 . . . William Archie Williams, did knowingly and willfully overvalue . . . a security, that is a check dated May 9, 1978, drawn on the account of W. A. Williams . . . at the Winn State Bank . . . in the amount of $58,500.00 . . . for the purpose of influencing the Pelican State Bank . . . a bank the deposits of which are insured by [FDIC] . . . upon an advance of money and extension of credit in that the Defendant presented said check for deposit at Pelican State Bank . . . and represented . . . to said bank that said check was of a value equal to the face amount of the check, when in truth and fact, as the Defendant then well knew, there were no sufficient funds in the account of W. A. Williams at the Winn State Bank . . . to cover said check, all in violation of [18 U.S.C. § 1014 (1976)]. . . ." [2]

Count III charged under the same statute and for the same type of offense as in

1. The statute provides as follows:

§ 656. Theft, embezzlement, or misapplication by bank officer or employee

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

As used in this section, the term "national bank" is synonymous with "national banking association"; "member bank" means and includes any national bank, state bank, or bank and trust company which has become a member of one of the Federal Reserve banks; and "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

2. The statute provides as follows:

§ 1014. Loan and credit applications generally; renewals and discounts; crop insurance

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the Reconstruction Finance Corporation, Farm Credit Administration, Federal Crop Insur-

Count II, but applied to Williams' May 10, 1978 transaction at the Winn Bank.

The cause came on for trial in federal district court in December 1979. The jury found Williams guilty on all counts. Judgment against him was pronounced on January 14, 1980. He received a prison sentence of six months as to Count III and five years probation as to Counts I and II together. This appeal followed.[3]

## II

Appellant's first assignment of error concerns an evidentiary ruling made under the § 656 charge. He contends that the trial judge improperly excluded certain exhibits and testimony relevant to the issue of fraudulent intent. It is our determination, however, that the trial judge properly exercised his discretion in refusing to admit the proffered evidence.

This circuit has identified the four essential elements of a violation of 18 U.S.C. § 656 (1976) as follows:

(1) that the accused was an officer, director, etc. of a bank,

(2) that the bank was connected in some way with a national or federally insured bank,

(3) that the accused willfully misapplied the money, funds, etc. of said bank, and

(4) that the accused acted with intent to injure and defraud said bank.

*United States v. Tidwell,* 559 F.2d 262, 265 (5th Cir. 1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978). *See supra* at 1314 n.1.[4]

An important component of Williams' defense to the § 656 charge was to attempt to negative the intent element by showing as one of the relevant facts and circumstances that at all pertinent times he maintained credits at Pelican Bank which exceeded his drawings upon the dummy account. *See, e. g., United States v. Tidwell,* 559 F.2d 262, 266 (5th Cir. 1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978); *United States v. Riley,* 550 F.2d 233, 236 (5th Cir. 1977); *United States v. Sorensen,* 330 F.Supp. 642 (D.Mont.1971). *But see United States v. Duncan,* 598 F.2d 839, 860 (5th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United*

---

ance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, any Federal intermediate credit bank, or any division, officer, or employee thereof, or of any corporation organized under sections 1131–1134m of Title 12, or of any regional agricultural credit corporation established pursuant to law, or of the National Agricultural Credit Corporation, a Federal Home Loan Bank, the Federal Home Loan Bank Board, the Home Owners' Loan Corporation, a Federal Savings and Loan Association, a Federal land bank, a joint-stock land bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, any member of the Federal Home Loan Bank System, the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, or the Administrator of the National Credit Union Administration, upon any application, advance, discount, purchase, purchase agreement, re-

purchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

3. There is also pending in this court an appeal from a post-conviction denial of Williams' motion for a new trial based on the ground of newly discovered evidence. *See United States v. Williams,* No. 80–3969 (5th Cir. Jan. 13, 1981) (order remanding to district court for consideration of Williams' motion for extension of time to file notice of appeal.)

4. The statute does not expressly mention the specific intent to injure and defraud. *See supra* at 1314 n.1. "Rather, the intent requirement has been judicially read into the statute on the basis of its legislative history." *United States v. Tidwell,* 559 F.2d 262, 265 n.2 (5th Cir. 1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978); *see United States v. Docherty,* 468 F.2d 989, 994–995 (2d Cir. 1972).

*States v. Southers*, 583 F.2d 1302, 1305 (5th Cir. 1978).

Williams testified first for the defense. He stated that prior to the events in question Pelican Bank had entered into an agreement with General Motors to finance the purchase of new car inventory by Taylor Motor Company, a local car dealership. This was apparently a standard floor planning arrangement.

Williams further related that in November 1977 the Pelican board voted to terminate this financing relationship. General Motors purportedly responded that Pelican remained obligated on cars still in transit or already delivered. Williams testified that he then undertook to advance Pelican whatever funds would be necessary to meet the financing commitment to General Motors. Williams stated that he did so in order to avert a lawsuit which could have impeded the bank's chances to obtain approval for the opening of a branch in Mansfield, Louisiana. According to Williams, the bank's total indebtedness to him amounted to $77,000 by May 9, 1978 as a result of his undertaking.

On cross-examination, Williams admitted that he did not have any notes for the loans he had allegedly made to the bank. He also answered evasively when questioned whether the bank's records contained any entries proving his assertion that he was a substantial creditor of the bank.

Stephen Roberts, a certified public accountant, was next on the stand for the defense. He testified that he found that between December 1977 and March 1978 approximately $56,000 had been injected into the bank but he could not unequivocally identify the source of the funds. He also indicated that the bank held a corresponding note from Taylor Motor Company for each injection and that the notes totaled to an amount equal to the amount of injected capital.

On rebuttal, the Government first introduced F. N. Gallaspy, chairman of the board of Pelican Bank during the period December 1977—May 1978 and also chairman of the audit committee of the bank during that time (and president of the bank after Williams' resignation). When asked whether Williams had been a creditor of the bank during the December—May period, he replied: "No sir. The reverse was true."

Next in rebuttal, the prosecutor presented Ollie Stone, a cashier at Pelican Bank during the period December 1977—May 1978. He testified that to the best of his recollection William Archie Williams had never been a creditor of the bank; instead, the reverse was true.

The prosecutor next called Ken Smith, a federal bank examiner who had participated in the audit of Pelican Bank in May 1978. He asserted that he did not discover any evidence at that time that Pelican Bank owed Williams large amounts of money.

Finally, the Government called Jessie Bridges, associated with Taylor Motor during the period in question. He testified that Taylor had owed Pelican a substantial amount of money during this period; to the best of his knowledge, however, Taylor had never been indebted to Williams. He stated that Taylor would give Pelican an interest-bearing note to cover the financing of each automobile. He indicated that he had no information that Williams may have been supplying Pelican with the funds it was using to meet its financing commitment on Taylor's inventory.

The trial judge held inadmissible a series of exhibits and accompanying testimony offered by appellant in support of his argument that he was at all relevant times in a net creditor position *vis-a-vis* Pelican Bank. The exhibits consisted of: 1) a letter of November 10, 1977 from Pelican to General Motors informing the latter that Pelican no longer intended to finance the purchase of new car inventory by Taylor Motors; 2) several promissory notes from Taylor Motors to Pelican Bank, dating from November and December 1977, each having a face value of several thousand dollars; 3) a

number of bank money orders and bank memoranda, dating from December 1977 to March 1978, evidencing total payments during this period of $56,393.87 from Taylor's account at Pelican to General Motors; 4) miscellaneous documentation relating to Taylor's new car purchases in the November—December 1977 period and the financing thereof by Pelican. The notes and payments are clearly related transactions, linked by Pelican's residual commitment to finance new car acquisitions by Taylor. The proffer indicates that cash was being injected into Pelican Bank during December 1977—March 1978 so that Pelican could honor its financing commitment. The proffer, however, contains no solid evidence as to the source of these injections.[5]

■ Appellant contends that the exclusion of the above items constitutes reversible error as to the § 656 charge. Under Fed.R.Evid. 403, the trial judge has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In our view, the trial judge properly exercised his discretion under Rule 403 to exclude the proffered evidence.

It is easily seen that the proffered evidence fails to shed any light upon the principal factual controversies left open by the evidence which was admitted: whether, and to what extent, William Archie Williams lent his personal funds to Pelican Bank so that it could meet its financing commitment to General Motors. Instead, the proffer is needlessly cumulative; that is, it merely leads to factual conclusions already amply

supported in the record (and which the jury apparently discounted). Worse, the proffered evidence would likely serve as a source of confusion. The record would be cluttered with numerous details of business transactions only tangentially related to the question of Williams' overdrafts. In a case already abounding with detail, such a prospect becomes especially undesirable.

In short, procedural costs more than substantially outweigh probative value. The trial judge acted correctly in excluding the proffered evidence from consideration under the § 656 count.[6]

### III

Appellant next excepts to the denial of his motion to suppress with respect to certain documentary materials allegedly obtained by the Government in violation of his Fourth Amendment rights. We are unable, however, to find any Fourth Amendment violation in this case.

In mid-1978, the U. S. Attorney in Shreveport and the FBI together undertook an investigation of Williams' personal banking activity. On October 12, 1978, FBI agent Thomas Ray arrived at Pelican Bank to speak with F. N. Gallaspy, then president of the bank and successor to Williams in this post (at this time, Williams' only official position at the bank was member of the board of directors). The meeting concerned an earlier request by Ray for any records in the possession of the bank which could prove useful to the investigation.

It had been established practice for the bank to hold Williams' monthly banking statements rather than mail them to him. Williams would come for them at random intervals, sometimes months after the is-

---

5. Defendant's Offer of Proof; Supp.R.I.

6. Appellant also contends that the exclusion of the proffered evidence represents reversible error as to the two § 1014 counts. The § 1014 counts relate to events which occurred on May 9 and May 10, 1978. The excluded evidence relates to events which transpired several months earlier. As such, the proffer was not relevant to the factual issues raised by the § 1014 counts. The trial judge acted properly in excluding the proffer from consideration under these counts. See Fed.R.Evid. 402, 403. We note that appellant's counsel conceded during the trial that the proffered evidence was irrelevant to the § 1014 counts.

suance of a statement. The statements were apparently kept in a wire basket located on a window ledge alongside the bank's main work space.

Preparatory to agent Ray's arrival, Gallaspy gathered from the window ledge five unsealed envelopes containing monthly checking statements, cancelled checks and deposit slips of William Archie Williams. The statements applied to Williams' checking activity at Pelican Bank from April through September 1978. Gallaspy delivered these documents to Ray after the latter's arrival. Gallaspy exercised custody over the documents by virtue of his position as bank president. Consequently, he had never actually sought Williams' permission.

Agent Ray had no search warrant covering the documents which came into his possession at Pelican Bank on October 12, 1978.

Before trial, Williams entered a motion to suppress, arguing that the Government's taking of his bank statements, checks and deposit slips represented a warrantless, illegal "search and seizure". An evidentiary hearing was conducted before a magistrate, who recommended that the motion be denied. The trial judge accepted the recommendation, finding that no reasonable or legitimate expectation of privacy had been violated. Williams now challenges the denial of his motion to suppress. We believe, however, that the lower court's rationale and result were sound.

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches and seizures conducted without the prior issuance of a warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347,

357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *see, e. g., Johnson v. Wright*, 509 F.2d 828, 829 (5th Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 445, 46 L.Ed.2d 384 (1975). The Supreme Court has uniformly "held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *see Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[7]

> This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," ......whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." .... The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" ......whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

*Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

The Supreme Court has squarely held that a bank customer has no legitimate expectation of privacy in the contents of original checks, deposit slips and financial statements pertaining to his account. *United States v. Miller*, 425 U.S. 435, 440–443, 96 S.Ct. 1619, 1622, 48 L.Ed.2d 71 (1976).

> The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain

---

7. In this case, the actual taking of the banking documents was carried out by a private employee of the bank. This individual, however, acted at the request of the FBI. In view of this, he is to be deemed an "agent" of the FBI for purposes of this case, so as to render the taking of the documents governmental action under the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 739 n.4, 99 S.Ct. 2577, 2579, 61 L.Ed.2d 220 (1979).

only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. The lack of any legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act, the expressed purpose of which is to require records to be maintained because they "have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings." 12 U.S.C. § 1829b(a)(1)....

*Id.* at 442–443, 96 S.Ct. at 1624.

Further, we note that the Supreme Court has "consistently ... held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–744, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979). The same reasoning should apply when, as here, an individual voluntarily places his personal papers in the custody of a third party who is also recognized to be familiar with their contents. The individual "assumes the risk" that these papers will be turned over to the authorities for their examination. *Id.* at 744, 99 S.Ct. at 2582. While his confidence may have been betrayed, his "legitimate" or "reasonable" expectation of privacy has not been violated.

■ *Miller* and *Smith, supra,* engender the following two conclusions pertinent to this case. First, Williams could entertain no legitimate expectation of privacy in the contents of the original checks, deposit slips and financial statements which he placed in the custody of Pelican Bank. Second, he could entertain no legitimate expectation that Pelican would not deliver these documents to the authorities for their perusal. These considerations effectively refute Williams' Fourth Amendment claim. No legitimate expectation of privacy has been invaded. The motion to suppress was properly denied.

8. *Supra* at 1315–1319.

## IV

Appellant's next assignment of error relates to the alleged insufficiency of the indictment to charge violations of 18 U.S.C. § 1014 (1976). Section 1014 provides in pertinent part:

Whoever knowingly makes any false statement or ... willfully overvalues any ... property or security, for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation [FDIC] ... upon any ... advance ... or loan ... or extension of ... the same ... shall be fined not more than $5,000 or imprisoned not more than two years, or both.

*See supra* at 1314 n.2. Appellant argues that the averments contained in Counts II and III[8] of his indictment cannot fairly be deemed to set forth violations of this statute.[9]

■ This argument is simply without foundation. Williams' actions at Pelican Bank and Winn Bank on May 9 and May 10, 1978 constitute classic incidents of check kiting.

"Check kiting ... involves more than the mere use of a check with insufficient funds in the bank to meet it. It involves a series of acts which taken together constitute a scheme, a studied device, false pretenses built upon a series of false representations designed to lull the banks involved into a feeling of confidence and security. A bad check is given. Money or credit is received from a bank other than the one on which the check is drawn. If credit is taken, that credit is usually drawn on immediately. The check kiter then deposits a check in the bank upon which the first check is drawn before the first check arrives there. The second check is drawn on the bank from which the first money or credit is received. Credit is taken for it and that credit

9. Appellant at no time raised this argument before the court below; it is being raised for the first time on this appeal.

covers the first check when it comes in and possibly additional credit. Then the process is carried on, back and forth, until the scheme is discovered."

*United States v. Payne,* 602 F.2d 1215, 1219 (5th Cir. 1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980), *quoting Fidelity and Casualty Co. of New York v. Bank of Altenburg,* 216 F.2d 294, 302–303 (8th Cir. 1954), *cert. denied,* 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744 (1955). Recently, this court held that check kiting violates § 1014. *United States v. Payne,* 602 F.2d 1215, 1216 (5th Cir. 1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980). Thus no question as to the sufficiency of the indictment can be raised.

### V

All other arguments and exceptions raised by appellant, although not directly addressed by this opinion, have been considered and found to be without merit.

Accordingly, after consideration of the record and the submissions of the parties, with oral argument of counsel, the judgment of conviction is affirmed.

AFFIRMED.