UNITED STATES of America, Appellee,

v.

Kevin KROWN, Maurice Benjamin, James Feeney, Henry Rosten, Roger Rosen and Anthony Costanzo, Defendants-Appellants.

Nos. 278 to 282, 370, 371, Dockets 81–1192, 1195 to 1197, 1203, 1204, 1254.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1981.

Decided April 1, 1982.

Carolyn Henneman, Asst. U. S. Atty. (John S. Martin, Jr., U. S. Atty., for the Southern District), New York City, for appellee.

Kevin Krown, defendant-appellant pro se.

Barry M. Fallick, New York City (Rochman, Platzer & Fallick, New York City), for defendant-appellant Maurice Benjamin.

Thomas F. Liotti, Carle Place, N.Y., for defendant-appellant Feeney.

Theodore Krieger, New York City, for defendant-appellant Rosten.

Joseph P. Hoey, Mineola, N.Y. (Suozzi, English, Cianciulli & Peirez, P.C., Mineola, N.Y.), for defendant-appellant Rosen.

Barry A. Bohrer, New York City, for defendant-appellant Costanzo.

Before MOORE and NEWMAN, Circuit Judges and GRIESA,* District Judge.

GRIESA, District Judge:

Kevin Krown, Maurice Benjamin, James Feeney, Henry Rosten, Roger Rosen and Anthony Costanzo appeal from judgments of the District Court for the Southern District of New York, following a five-week jury trial before Hon. Lee P. Gagliardi, convicting each of them on multiple counts of violation of federal anti-fraud statutes.

We affirm the convictions, except that we reverse as to two counts (53 and 54) of the 49 counts on which Krown was convicted, and as to three counts (53, 54 and 55) of the eight counts on which Benjamin was convicted.[1] Counts 53, 54 and 55 of the indictment charge these defendants with passing worthless checks in violation of 18 U.S.C. § 1014. We hold that this statute is inapplicable to the type of conduct charged.

The proof at trial showed a fraudulent scheme built around two fictitious off-shore banks called First London Bank and Trust Co. and First National Bank of Teheran purportedly located in St. Vincent, West Indies. Large amounts of money were obtained from various victims by the use of fraudulent financial instruments held out as being issued by these banks.

We have considered all the issues raised on appeal, and find that all are without merit except the challenge to the applicability of § 1014.

I.

The facts relevant to this issue are as follows. In November 1978 a company connected with Benjamin purchased certain quantities of meat from a wholesale supplier, one Theresa Amelar. In payment for the first two shipments Benjamin gave Mrs. Amelar two purported certified checks drawn on First National Bank of Teheran ("FNBT") in the amounts of $15,000 and $45,000.

Mrs. Amelar deposited these checks in her account at Marine Midland Bank. Marine Midland put these checks into the federal clearinghouse system for collection. They were promptly returned to Marine Midland stamped "No Such Bank." Mrs. Amelar informed Benjamin of this. Benjamin said

---

* The Honorable Thomas P. Griesa of the United States District Court for the Southern District of New York, sitting by designation.

1. Krown was sentenced to 15 years imprisonment and was fined a total of $86,000. Benjamin was sentenced to 6 years imprisonment and was fined a total of $29,000. The partial reversals as to Krown and Benjamin will not reduce their terms of imprisonment. However, Krown's fines will be reduced by $10,000 ($5,000 on each of the two reversed counts), and Benjamin's fines will be reduced by $15,000 ($5,000 on each of the three reversed counts).

to have Marine Midland mail the checks directly to St. Vincent for collection. Accordingly, the checks were resubmitted to Marine Midland, which mailed them to St. Vincent.

While this process was going on, Benjamin placed an order with Mrs. Amelar for a third shipment of meat. This order was filled, and Benjamin gave Mrs. Amelar a third purported certified check drawn on FNBT. This check was for $29,919.32, and was deposited with Mrs. Amelar's account at Marine Midland, which mailed the check directly to St. Vincent for collection.

Later, Benjamin obtained a genuine Bankers Trust Company certified check for $15,000. He sent it directly to Marine Midland for deposit in Mrs. Amelar's account. This was done in order to make it appear to Mrs. Amelar that the original $15,000 FNBT check had been honored.

Ultimately, of course, Marine Midland's efforts to collect the three checks from FNBT were fruitless. Although the amounts of the three fraudulent checks were temporarily credited to Mrs. Amelar's account, by way of a bookkeeping entry, there is no evidence that Mrs. Amelar made any withdrawal from her account or received a payment of any kind from the bank, based on the balance created by the three checks.

It does not appear that Krown participated directly in the dealings with Mrs. Amelar, although it was he who "created" the fictitious FNBT.

Marine Midland Bank is a bank whose deposits are insured by the Federal Deposit Insurance Corporation.

## II.

Section 1014 provides in pertinent part: "Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

Judge Gagliardi charged the jury on the elements which needed to be proved for conviction on the § 1014 counts:

"The essential elements which must be proved in order to establish this offense against any defendant are:

1. That the defendant in question knowingly made, caused to be made or aided and abetted the making of the false statement or overvaluation concerning a material fact;

2. That the statement was made for the purpose of influencing the bank's action with respect to an application or advance, commitment or loan;

3. That the bank was insured by the FDIC."

In his explanation of the term "overvaluation" in the first element, the judge made it clear that he was referring to the overvaluation of security within the language of § 1014, and stated to the jury that a check, about which a false statement has been made as to its value, would be an overvalued security.

Thus, under the trial judge's instruction, the jury was permitted to find Benjamin and Krown guilty under § 1014, if the jury found that they made or caused to be made a false statement or overvaluation of security which had the purpose of influencing a bank upon an advance, loan, application or commitment.

An initial question is whether the statute is limited to frauds committed directly against the financial institutions referred to in the statute. Benjamin's fraud was directed primarily against Mrs. Amelar. Benjamin did not deal directly with Marine Midland, except in the one instance when he sent the $15,000 Bankers Trust check for deposit in her account.

■ The statute is not limited by its terms to direct dealings with banks. It covers the making of false statements "for the purpose of influencing in any way" the action of an FDIC insured bank upon certain types of transactions. Thus, the statute is broad enough to apply to fraudulent dealings with third persons where it could *also* be said that there was the purpose to influence a bank upon one of the transactions named in the statute.

In the present case, when Benjamin gave the first two FNBT checks to Mrs. Amelar, he must have known that she would deposit these checks in a bank. After Mrs. Amelar told Benjamin about the problem with the checks, Benjamin's suggestion to have Marine Midland send the checks directly to St. Vincent was designed to prolong the bank's collection process in order to gain time for further fraudulent dealings with Mrs. Amelar. With regard to the third FNBT check, Benjamin intended that the check be deposited in the bank and that the bank would undertake collection via mail to St. Vincent. Benjamin's deposit of the Bankers Trust check at Marine Midland was an additional act intended to maintain a facade of regularity in his dealings with Mrs. Amelar.

■ Thus Benjamin was using Marine Midland to facilitate his fraud against Mrs. Amelar. In terms of the statute, it can be said that he had "the purpose of influencing" Marine Midland to accept the certified checks for deposit in Mrs. Amelar's account and to process those checks for collection over as long a time as possible.

This brings us to the issue of whether the certified FNBT checks were false statements or overvalued security within the meaning of § 1014, and the further issue of whether Benjamin had the purpose of influencing the bank in connection with an advance, loan, application or commitment.

■ It would seem clear that a fraudulent certified check can be a false statement within the meaning of § 1014. Such a check constitutes a representation that the check has been accepted by the drawee bank and will be paid upon presentation. It would also appear that a worthless check could, under certain circumstances, constitute overvalued security for an advance, loan or commitment.

■ However, there is no basis in the evidence for a finding that Benjamin had the purpose of influencing the bank to use the FNBT checks in connection with an advance, loan, application or commitment. The interpretation of these terms in the statute has produced a split in the circuit decisions. The Fifth Circuit has held that the deposit of worthless checks in a bank and subsequent withdrawal of funds based upon those checks, can constitute an advance or loan within the meaning of § 1014. *United States v. Williams*, 639 F.2d 1311 (5th Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 565, 70 L.Ed.2d 473 (1981); *United States v. Payne*, 602 F.2d 1215 (5th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980). Both of these cases involved check kiting schemes. The theory of these decisions is that the banks granted immediate credit to the depositors by permitting withdrawals from the account prior to the collection of the deposited checks, and that such immediate credit was an advance or loan. The Third Circuit, declining to follow the *Payne* and *Williams* decisions, has held § 1014 inapplicable to a check kiting scheme. *United States v. Sher*, 505 F.Supp. 858 (W.D.Pa.), *aff'd per curiam*, 657 F.2d 28, *reh'g en banc denied*, 661 F.2d 34 (3d Cir. 1981). The *Sher* decision relied upon the reasoning in *United States v. Pavlick*, 507 F.Supp. 359 (M.D.Pa. 1980). The Third Circuit cases express concern about the possibility that an expansive reading of § 1014 will make that statute a general criminal remedy against the passing of worthless checks, contrary to Congressional intent.

■ We agree that § 1014 is not designed to have general application to the passing of worthless checks, and that the language of the statute, limiting it to the specified credit transactions, must be given effect. The Second Circuit has warned against construing § 1014 in such a manner as to transform what would normally be

state criminal offenses into federal crimes. *United States v. Sabatino*, 485 F.2d 540, 543 (2d Cir. 1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974).

It is unnecessary for us to choose between the Fifth Circuit and Third Circuit views regarding the applicability of § 1014 to check kiting schemes, because the present case does not involve check kiting. Also, it is unnecessary for us to decide whether the granting of immediate credit by a bank, in the form of permitting a withdrawal of funds prior to the collection of a deposited check, constitutes an advance or loan within the meaning of § 1014. In the present case there was no such granting of immediate credit or permission to withdraw funds. All that occurred between Mrs. Amelar and the bank was that she deposited the checks in her account, following which the bank made a bookkeeping entry showing the checks credited to her account, and then attempted to collect the checks. Mrs. Amelar received no funds from the bank based upon the three fraudulent checks, either in the form of a conventional advance or loan or by way of a withdrawal from her account. The mere bookkeeping credit entry did not constitute an advance or loan within the meaning of § 1014.

Not only was there in fact no advance or loan to Mrs. Amelar, but there is no evidence that Benjamin had the purpose of influencing the bank in connection with an advance or loan. The mere intent to have the bank accept the certified checks for deposit and carry out collection procedures is not sufficient to violate the statute.

It is equally true that there was no "application" or "commitment," or any evidence of a purpose by Benjamin to cause such. These broad terms must be interpreted with reference to the statute as a whole, and can only refer to an application or commitment involving an advance or loan or other credit transaction listed in the statute. *See United States v. Pavlick*, 507 F.Supp. 359, 362 (M.D.Pa.1980). The case relied upon by the Government for the proposition that there was a commitment in the present case, *United States v. Stoddart*, 574 F.2d 1050 (10th Cir. 1978), is distinguishable. That case involved an agreement by a bank to permit a withdrawal from an account following a fraudulent representation to the bank by the depositor.

For the foregoing reasons Benjamin's conviction on the § 1014 counts cannot stand. The convictions of Krown on these counts must also fall, since Krown's liability could only derive from that of Benjamin.

The convictions are affirmed, except as to Counts 53 and 54 against Krown and Counts 53, 54 and 55 against Benjamin. As to these counts, we reverse and remand with directions to enter judgments of dismissal.