**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 91-6261**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**DOUGLAS JAMES HORD,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Southern District of Texas**

_____
(October 22, 1993)

Before KING and BARKSDALE, Circuit Judges, and PARKER, District Judge.[1]

BARKSDALE, Circuit Judge:

This appeal concerns, _inter alia_, multiplicious convictions for bank fraud, and turns, once again, on the question of when a "scheme" is "executed" for purposes of the bank fraud statute, 18 U.S.C. § 1344(a)(1). Douglas James Hord was convicted on 19 counts: nine for executing and attempting to execute a scheme to defraud a federally insured bank, in violation of § 1344(a)(1); and ten for making false statements to the bank, in violation of 18 U.S.C. § 1014. He was sentenced, _inter alia_, to 19 concurrent six-

---

[1] Chief Judge of the Eastern District of Texas, sitting by designation.

month terms of imprisonment.  We **AFFIRM IN PART** and **REVERSE** and **VACATE IN PART**.

I.

Hord's convictions arose from a series of bank transactions involving bogus checks,[2] in which he participated in 1988.[3]  The transactions for which Hord was indicted began in April 1988.[4]

---

[2]  The parties variously refer to the checks as "fake", "forged", "counterfeit", "phony" and "bogus".  We will use the term "bogus".

[3]  In 1987, Hord, an attorney with a history of financial problems, became friends with John David Williams, an employee of the Federal Deposit Insurance Corporation.  Although Hord did not testify at trial, he gave his probation officer the following account of the scheme he and Williams developed:  Williams suggested to Hord that he knew a way to make a lot of money without being caught.  Williams had bought blank stock checks and a routing/transit coder (with which to imprint checks with routing numbers) at an FDIC auction; these could be used to print bogus checks.  Williams told Hord that he knew in advance which banks were scheduled to be closed by the FDIC.  Hord would open an account in a bank scheduled for closing, using the bogus checks the two had printed, signed, and endorsed.  Once the bank closed, Hord would immediately withdraw the funds from the account; Williams's job was to "pull" the returned checks once the FDIC became involved, thus covering up the evidence of the transactions.

[4]  Pursuant to Fed. R. Evid. 404(b), the government also presented evidence of other similar transactions, beginning early in 1988.  In late March 1988, Hord deposited 16 counterfeit checks, each for $950, into his business account at MBank.  The checks were payable to Coleman Construction and were signed, "Martin Van Clark".  In fact, however, Hord had signed the checks, forging Van Clark's name.  Hord was given credit for these checks, and withdrew the money (approximately $15,000).  MBank later learned the checks were bogus because, although they purportedly were drawn on the account of Van Clark Construction at Texas Commerce Bank, they had routing and account numbers from an account at U.S. Bank and Trust in New York.  Hord's parents made restitution to MBank for these funds.

In April 1988, Hord opened a "trust account" at Cy-Fair Bank in Houston, and deposited a bogus check, payable to the Winifred Mae Hunter estate.  Hord quickly withdrew $2,438.45, the full amount of the check, from this account.  Cy-Fair was closed by the FDIC shortly thereafter.

Using a $300 check drawn on his account at First Interstate Bank, Hord opened a checking account at National Bank of Texas (NBT) in Houston on April 20, 1988. He explained to the account representative that he was an attorney, and would be using the account as a trust account to probate the estate of a Florida client.

Between April 21 and 26, 1988, five deposits were made to the account. Hord first deposited three bogus checks into the NBT account. The checks, accompanied by a deposit slip and totalling $9,634.96, were made payable to the estate of Winifred Mae Hunter. Later, Hord deposited another bogus check for $4,138, again using a deposit slip. Again, the check was payable to the Hunter estate. Bank employees immediately suspected a problem with the checks; they were poorly printed on poor-quality paper, and had incorrect routing numbers. Bank management notified the FBI, and told the employees to continue accepting the checks, but to refuse to clear them or tell Hord that he was under suspicion.

A few days later, Hord deposited three more bogus checks, totalling $68,549.70, with a deposit slip. Three additional bogus checks were also deposited into the account that day, by Hord or someone else: one check for $82,500 in the first transaction; two, totalling $57,425, in the second.[5]

Hord tried to make three withdrawals from the NBT account. On April 22, he deposited a check for $16,000, drawn on the NBT

---

[5]    Hord's fingerprint was on the deposit slip submitted with the $82,500 check; the signatures on the checks that day were forged by Hord.

account, into his account at MBank.  It was later returned unpaid. And, on or about April 26, he tried first to withdraw $1,000; he was told the funds had not yet cleared.  Later, he requested $250 at the drive-in window.  Again, the bank refused to allow him to make a withdrawal.

NBT was insured by the FDIC, which closed NBT in May 1988. Sometime after this, First Interstate Bank returned to NBT the $300 check Hord had used to open the NBT account, because there were insufficient funds in Hord's First Interstate account.  Hord received notice of a "charge back" for $300, as well as a charge back for a $8,100 check drawn on a Florida bank, and payable to Winifred Mae Hunter, estate trustee.  NBT also advised Hord by letter that his account had been closed and his records subpoenaed by the FBI.

Hord was indicted in July 1990 on nine counts of executing and attempting to execute a scheme to defraud NBT, in violation of 18 U.S.C. § 1344(a)(1); and ten counts of making false statements to NBT, in violation of 18 U.S.C. § 1014.  A jury convicted him on all 19 counts.  After the verdict, the government moved for a downward departure in sentencing, based on Hord's assistance in the investigation and possible prosecution of Williams.  *See* U.S.S.G. § 5K1.1(a).  The trial court overruled Hord's objections to the presentence report, but agreed to depart downward in accordance with the government's recommendation.  The applicable guidelines range for sentencing was a term of imprisonment of 18-24 months. After the downward departure, Hord was sentenced to six months in

prison on each of the 19 counts, running concurrently.  He was also ordered to pay $2,438.45 in restitution,[6] and a special assessment of $50 per count (totalling $950).  Finally, Hord was sentenced to a two-year term of supervised release following his imprisonment on counts one-nine, to run concurrently with a one-year term of supervised release for counts ten-19.

## II.

Hord contends that the nine bank fraud charges under § 1344 were multiplicious, with the sentences imposed as a result violating the double jeopardy clause of the Fifth Amendment; and that his convictions on the ten false statement counts must be reversed, and those counts dismissed, because the government failed to allege or prove a violation of § 1014.[7]

## A.

Count one of the indictment charged that Hord had executed the scheme by opening a trust account at NBT; counts two-six, that he had executed the scheme by making the five deposits, or causing them to be made; and counts seven-nine, that he had attempted to

---

[6]   The amount that Hord withdrew from Cy-Fair Bank, *see supra* note 4.

[7]   Hord also appeals the restitution order.  Because he volunteered to pay restitution, any error in imposition of the restitution order was invited, and cannot be raised on appeal. *See, e.g.*, *Howell v. Gould, Inc.*, 800 F.2d 482, 487 (5th Cir. 1986); *Farrar v. Cain*, 756 F.2d 1148, 1151 (5th Cir. 1985), *aff'd*, ___ U.S. ___, 113 S. Ct. 566 (1992).  Further, we find no plain error in the restitution order.  *See United States v. Gaudet*, 966 F.2d 959, 964 (5th Cir. 1992) (where defendant made no objection in district court, restitution order will be reviewed only "under the weak plain error lens"), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1294 (1993).

execute the scheme by attempting to withdraw funds from the account on three occasions (on or about April 22 and 25).

Hord contends that all nine counts relate to the same offense -- a single scheme to defraud a single financial institution. Before trial, he moved, as required, to consolidate all nine counts on the ground that they were multiplicious; the district court denied the motion. Because, as hereinafter discussed, we agree that counts one and seven-nine were multiplicious, we reverse those convictions and vacate the sentences imposed pursuant to them.[8] We

---

[8] We note that, as a rule, an appeal cannot be based on multiplicity where sentences are to be served concurrently. *See, e.g.*, **United States v. Galvan**, 949 F.2d 777, 781 (5th Cir. 1991). However, in cases such as Hord's, where a monetary assessment is also involved, a multiplicity claim still is viable. **Id.**; *see also* **Ray v. United States**, 481 U.S. 736 (1987) (per curiam).

Normally, for convictions on multiplicious counts, "the remedy is to remand for resentencing, with the government dismissing the count(s) that created the multiplicity." **United States v. Moody**, 923 F.2d 341, 347 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 80 (1991), *quoted in* **United States v. Lemons**, 941 F.2d 309, 317 (5th Cir. 1991) (per curiam). Generally, on remand, the government elects which count(s) to dismiss, and the court resentences the defendant on the remaining count(s). **United States v. Brechtel**, 997 F.2d 1108, 1112 (5th Cir. 1993) (per curiam); **United States v. Heath**, 970 F.2d 1397, 1402 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1643 (1993); **United States v. Saks**, 964 F.2d 1514, 1526 (5th Cir. 1992). Here, however, we hold that counts one and seven-nine created the multiplicity. Therefore, there is no need for the government to make an election.

The government, which concedes multiplicity, does not request resentencing. Furthermore, Hord has served his six-months' imprisonment, and is on supervised release. And, the district judge apparently relied heavily on the government's recommendation for downward departure in calculating Hord's sentence. Based on the record, we think the district court would impose the same sentence on remand. Therefore, we see no need to remand for resentencing on the counts we affirm. *Cf.* **United States v. Johnson**, 961 F.2d 1188, 1189 (5th Cir. 1992) (citing **Williams v. United States**, ___ U.S. ___, 112 S. Ct. 1112, 1120-21 (1992)) (remand for resentencing under guidelines unnecessary if the

affirm the convictions and sentences imposed pursuant to counts two-six.

Following Hord's conviction, we have had occasion to review the issue of multiplicity under the bank fraud statute. *See, e.g.*, *United States v. Lemons*, 941 F.2d 309 (5th Cir. 1991) (per curiam). An indictment that charges a single offense in more than one count is multiplicious. *Id.* at 317. The primary danger created by such an indictment is that the defendant may receive more than one sentence for a single offense, in violation of the double jeopardy clause. *Id.* (quoting *United States v. Swaim*, 757 F.2d 1530, 1537 (5th Cir.), *cert. denied*, 474 U.S. 825 (1985)). We review such issues *de novo*. *See, e.g.*, *United States v. Brechtel*, 997 F.2d 1108, 1112 (5th Cir. 1993) (per curiam).

The crux of any argument that convictions are multiplicious is, of course, what constitutes the offense charged. "`Whether a continuous transaction results in the commission of but a single offense or separate offenses ... is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed.'" *Swaim*, 757 F.2d at 1536 (quoting *United States v. Shaid*, 730 F.2d 225, 231 (5th Cir.), *cert. denied*, 469 U.S. 844 (1984)), *quoted in* *Lemons*, 941 F.2d at 317. Therefore, our first task is to review what constitutes the offense of bank fraud under § 1344.[9]

---

"district court would have imposed the same sentence").

[9] Hord was charged and convicted under former § 1344(a)(1). At the time, § 1344(a) provided:

In *Lemons*, we noted that "the bank fraud statute imposes punishment ... for each *execution* of the scheme" to defraud, rather than for each act in execution of the scheme. 941 F.2d at 318 (emphasis added). *Lemons* involved a fraudulent scheme to, *inter alia*, procure $212,000 from a single financial institution; however, the defendant received the money in a series of transactions occurring over the course of several months. *Id.* We held that the incremental movement of the benefit to the defendant was "only part of but one performance, one completion, one execution of that scheme." *Id.* Similarly, in *United States v.*

---

> (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice --
>
> > (1) to defraud a federally chartered or insured financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

18 U.S.C. § 1344(a) (1988), *amended by* 18 U.S.C. § 1344 (Supp. I 1989).

Former § 1344(b) defined "federally chartered or insured financial institution" as used in § 1344(a). *Id.* at § 1344(b). In 1989, § 1344 was amended by, *inter alia*, deleting former part (b). Former part (a) simply became § 1344. 18 U.S.C. § 1344, *as amended by* Pub. L. No. 101-73, Title IX, § 961(k), 103 Stat. 500 (1989). "Financial institution" is now defined in 18 U.S.C. § 20. Pub. L. No. 101-73, Title IX, § 962(e), 103 Stat. 523 (1989). The amended § 1344 also changes the penalties for a violation of the section to a fine of not more than $1,000,000 or imprisonment for not more than 20 years, or both. 18 U.S.C. § 1344 (Supp. 1993); *see also United States v. Medeles*, 916 F.2d 195, 196-97 and 197 n.1 (discussing amendments to § 1344).

*Heath*, 970 F.2d 1397, 1402 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1643 (1993), we found a single execution of a scheme to defraud, although the scheme involved procuring two separate loans from a single financial institution. A critical factor in our holding in **Heath** that there had been but a single execution of the scheme was the fact that the two loans were integrally related; neither could have succeeded without the other. *Id.*

In Hord's case, the scheme to defraud, as stated in the indictment,

> consisted essentially of a plan to deposit forged and counterfeited checks in a trust account opened in the name of ... HORD and to withdraw the money credited to that account as a result of those deposits.

The government concedes, and we agree, that opening the account (count one) did not constitute an execution of the scheme, but was instead only a necessary act in preparation of the scheme. We, therefore, hold that count one is multiplicious.

The transactions for which Hord was indicted are five deposits (counts two-six), and three attempts to withdraw part of those deposits (counts seven-nine). As stated, counts seven-nine (withdrawal attempts) are multiplicious. It is the deposits, not Hord's withdrawal attempts, that constitute executions of the scheme. The attempted withdrawals were integrally related to the deposits, and could not have succeeded without them. *See* **Heath**, 970 F.2d 1397. Further, the deposits, without more, satisfy § 1344's prohibition against "execut[ing], or attempt[ing] to

execute, a scheme or artifice" to defraud the bank. 18 U.S.C. § 1344. While the term "scheme to defraud" in § 1344 is not "capable of precise definition", *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987), *cited in Lemons*, 941 F.2d at 315, we have no doubt that Hord's making deposits using bogus checks with forged signatures and in the name of a fictitious payee, satisfies the requirements of the statute.[10] *Accord*, *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir.) (holding that "in making each deposit [defendant] was executing his scheme to defraud" bank), *cert. denied*, 498 U.S. 901 (1990). In sum, the counts concerning Hord's attempts to withdraw funds are multiplicious to those involving his deposits.

Admittedly, the argument that a bogus check scheme of the sort in issue is not executed until a withdrawal is attempted has considerable force. The withdrawal is the final step -- it is to place the funds in the defendant's hands. And, *Lemons* is strong support for the rule that the scheme must be completed or performed in order for it to be executed. 941 F.2d at 318.

On the other hand, *Lemons* also counsels that "the question in each case is what constitutes an `execution of the scheme'". 941 F.2d at 317 n.5. On the facts in this case, the scheme was executed with the deposit of each bogus check, because that was the event that triggered possible instant credit being given to the

---

[10] We have previously defined the term "scheme" to include using "fraudulent pretenses or misrepresentations intended to deceive others to obtain something of value, such as money, from the institution to be deceived." *See Lemons*, 941 F.2d at 314.

account and therefore available to Hord.  How, and when, Hord decided to use that hoped-for credit -- either by direct withdrawal of cash or by drawing a check against it -- was up to him.

The deposits best gauge the extent of the possible loss, for it may well be, as in this case, that the withdrawals will be for a lesser amount.  Moreover, it was the deposits that put the bank at risk.  And, risk of loss, not just loss itself, supports conviction.  *United States v. Barakett*, 994 F.2d 1107, 1111 (5th Cir. 1993), *petition for cert. filed* (U.S. Sept. 22, 1993) (No. 93-6128); *Lemons*, 941 F.2d at 316 n.3.  No matter that, in this case, the bank quickly discovered the scheme and avoided loss.  With each deposit, it was put at risk.  Even after the scheme was discovered and the bank was taking affirmative action to protect itself, credit could have still been given through mistake or oversight.

In this case, to equate withdrawal (or its attempt) with execution is to allow the bank to have been placed at risk five times, but for Hord to have only executed the scheme three times.  What if Hord had not even attempted a withdrawal; surely it cannot be said that he had not put the bank at risk?  If, in a case of this sort, a withdrawal must be attempted, even though the fraud is known, the danger of additional loss builds while awaiting the withdrawal attempt and, therefore, the occasion to charge fraud. Section 1344 does not require that.

As noted *supra*, and as stated in *Lemons*, the question in each case brought under § 1344 "is what constitutes an `execution of the scheme'".  914 F.2d at 317 n.5.  We cautioned there that we did

"not hold that the execution of a scheme cannot result in the imposition of multiple liability under § 1344". *Id.* at 318 n.6. Hord asserts that he can be convicted for only one execution; at most, for three (the withdrawal attempts). We do not agree that the transactions constituted but a single execution of the scheme. Instead, as stated, we conclude that each deposit constituted a separate execution of it. Unlike the situations in **Heath** and **Lemons**, the deposits were not integrally related *to one another*, such that none could have succeeded without the others. Proof of Hord's intent to defraud NBT with each fraudulent deposit does not require proof of any of the other deposits. *See **United States v. Farmigoni***, 934 F.2d 63 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 1160 (1992) (involving a single scheme, executed two times, in which two banks were defrauded).

Nor does the fact that a single bank was the victim necessarily prove a single execution of the scheme. *See **Schwartz***, 899 F.2d at 248 (holding each deposit of worthless checks into account at single bank to be separate execution of single scheme), *cert. denied*, ___ U.S. ___, 111 S. Ct. 259 (1990); **United States v. Poliak**, 823 F.2d 371, 372 (9th Cir. 1987) (holding writing of ten separate checks in check-kiting scheme to be ten separate executions of scheme to defraud three banks), *cert. denied*, 485 U.S. 1029 (1988), *cited with approval in **Lemons***, 941 F.2d at 317 & n.5. As noted, a single scheme, if executed more than once, may support multiple convictions. **Lemons**, 941 F.2d at 317. We hold that each deposit constituted a separate execution of a single

- 12 -

scheme to defraud NBT; and, therefore, we affirm Hord's convictions and sentences on counts two-six of the indictment.[11]

B.

"To sustain a conviction under 18 U.S.C. § 1014, the Government must demonstrate that (1) the defendant made a `false statement or report,' and (2) the defendant did so `for the purpose of influencing in any way the action of [a described financial institution] ... upon any application, advance, ... commitment or loan.... '" *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir. 1986).[12] For counts ten-19, Hord asserts that the government failed

[11] As stated, we find Hord's behavior at NBT to have been multiple executions of a single scheme. Hord used a single trust account, representing that it was for the purpose of handling the estate of a Florida client. In accordance with that representation, each of the separate deposits contained similar bogus checks payable to the same fictitious payee.

We note, however, that similar behavior, engaged in on separate occasions, may sometimes constitute several *separate schemes* to defraud a financial institution. *See* **Barakett**, 994 F.2d 1107. There, our court held that the defendant had engaged in four separate schemes, pursuant to which he defrauded two banks. Crucial to that holding was the fact that the defendant in **Barakett** could

> identify no linkage between the conduct charged in counts one and two [i.e., to defraud the first bank], or between that of counts three and four [i.e., to defraud the second bank] other than victim and *modus operandi*. Because counts one through four involved separate fraudulent schemes, separate sentencing present[ed] no multiplicity problem.

*Id.* at 1111.

[12] 18 U.S.C. § 1014 makes it a crime to

> knowingly make[] any false statement ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured

- 13 -

to either charge or prove an offense under § 1014, contending that it failed to either allege in the indictment or prove at trial that he made a false statement, or that he did so for the purpose of influencing the bank in a lending activity. Hord maintains, first, that checks are not "false statements" for § 1014 purposes; and second, that he made no representation for the purpose of obtaining an advance, loan, or similar commitment from the bank. We disagree. We address these contentions initially as they concern the indictment, and then as they concern the proof.

1.

Hord contends that the government did not sufficiently allege in the indictment that he made any "false statement" under the terms of § 1014. He also contends that the government failed to allege in the indictment that he had acted with the purpose of influencing the bank's action with respect to one of the transactions specified in § 1014. The indictment stated, in counts ten through 19, that Hord

> did knowingly *make a false statement* ... for the purpose of influencing the action of the National Bank of Texas, the deposits of which were then insured by the [FDIC] ... in that [Hord] submitted forged and counterfeited checks ..., *in order to induce the bank to credit his account accordingly*[.]

(Emphasis added.)

Before trial, Hord moved unsuccessfully to dismiss the indictment for failing to allege a violation of law. Because Hord

---

> by the ... Federal Deposit Insurance Corporation, ... upon any ... advance, ... commitment, or loan....

objected in district court to the sufficiency of the indictment, we review the indictment *de novo*, to determine whether it alleges sufficiently the elements of the offense charged. ***United States v. Aguilar***, 967 F.2d 111, 112 (5th Cir. 1992) (citing ***United States v. Shelton***, 937 F.2d 140, 142 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 607 (1991)).

The indictment expressly charges that Hord made a "false statement" by "submit[ting] forged and counterfeited checks". At least as to this element of § 1014, then, the indictment was sufficient. Accordingly, we proceed to the contention that the indictment does not sufficiently allege that Hord made those false statements with the intent to induce the bank to make an advance, commitment, or loan.

Section 1014 does not include in its list of prohibited actions the act of inducing a bank to "credit an account". However, acting to induce a bank to "credit an account" can, under certain circumstances, be equivalent to acting to induce it to make an advance, commitment, or loan. We realize, of course, that a depositor ordinarily stands in the position of a creditor of the bank, rather than the other way around. *See, e.g.*, ***In Re Texas Mortgage Servs. Corp.***, 761 F.2d 1068, 1075 n.11 (5th Cir. 1985); Uniform Commercial Code § 4-201, cmt. 4. As Hord asserts, this ordinarily would mean that inducing the bank to "credit" Hord's account would *not* constitute inducing it to make an advance, loan, or commitment, because the bank would merely be making available to its creditor, Hord, his "own" deposited funds. Usually, this does

not occur until after the deposited check has cleared. *See* Uniform Commercial Code § 4-215(e) (stating when funds become available for withdrawal as of right); Federal Reserve Regulation CC: Availability of Funds and Collection of Checks, 12 C.F.R. § 229 (1992). In fact, this was NBT's policy. But, under the language of both § 1014 and the indictment, in issue is Hord's *intent to induce* NBT to advance funds to him without waiting for the checks to clear, not NBT's policy against doing so.

In situations where the bank gives a customer access to funds without waiting for deposited checks to clear, it is making an advance on the security of the checks it holds for collection. *See* Uniform Commercial Code § 4-210(3), cmt. 1 ("A collecting agent may properly make *advances* on the security of paper held for collection, and acquires at common law a possessory lien for these advances." (emphasis added)). In this situation, we think, the language "in order to induce the bank to credit [Hord's] account" is sufficiently equivalent to stating that Hord acted "in order to induce the bank to make an advance, loan, or commitment". *See* **Price**, 763 F.2d at 643 & n.4 (depositing false credit card sales receipts constituted attempt to "obtain cash from the bank to which [defendants] were clearly not entitled"). Therefore, we hold that the indictment was sufficient to charge an offense under both elements of § 1014.

More importantly, although **Williams v. United States**, 458 U.S. 279 (1982), discussed *infra*, holds that presenting checks drawn against insufficient funds is not a "false statement" for § 1014

purposes, it does not address what constitutes "influencing in any way the action of ... any bank ... upon any ... advance ... or loan ...." 18 U.S.C. § 1014. Our court held long ago in *United States v. Payne*, 602 F.2d 1215, 1218-19 (5th Cir. 1979), *cert. denied*, 445 U.S. 903 (1980), that "[t]he essence of check kiting is the obtaining of credit in the nature of an advance or loan, however it may be characterized"; that it "was a device for fraudulently obtaining credit sufficiently in the nature of an advance or loan to come within the scope of 18 U.S.C. § 1014." The Supreme Court's holding in *Williams* does not displace this aspect of proof necessary for the latter part of the statute. *See Williams*, 458 U.S. at 300-01 (Marshall, J. dissenting) ("The banks that extended funds on the basis of Williams' worthless, and not yet collected, checks made an `advance,' a `loan,' and a `commitment' within the ordinary meaning of these terms.") The above language from *Payne* is still good law.

2.

Hord also contends that the government failed to prove the substantive elements of § 1014 (whether he made any "false statement", and if so, whether it was to induce the bank to engage in a specified action). This contention is essentially a sufficiency of the evidence claim. We will affirm a conviction if the evidence, viewed in the light most favorable to the verdict and with all reasonable inferences and credibility choices made in support of it, is such that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Heath*,

970 F.2d at 1402 (citing **Jackson v. Virginia**, 443 U.S. 307 (1979), and **United States v. Kim**, 884 F.2d 189, 192 (5th Cir. 1989)).

a.

In support of his contention on the "false statements" issue, Hord relies principally on **Williams**, 458 U.S. 279, for the proposition that checks are not false statements. We find his reliance misplaced, however. In **Williams**, the defendant engaged in a check-kiting scheme, knowing that his accounts did not contain sufficient funds to cover the checks. **Id.** In reversing his conviction under § 1014, the Court held that a check drawn on insufficient funds is not "a `false statement,' for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as `true' or `false.'" **Id.** at 284.

This was so, the Court stated, because a check drawn on insufficient funds does not, "in [its] terms, make any representation as to the state of [the drawer's] bank balance." **Id.** at 284-85. The Court also noted that "`false statement' is not a term that, in common usage, is often applied to characterize `bad checks.'" **Id.** at 286. Finally, the Court also reasoned that to hold that a "bad check" (*i.e.*, a check drawn on insufficient funds) is a "false statement" under § 1014 would "make a surprisingly broad range of unremarkable conduct a violation of federal law." **Id.**[13]

---

[13] **Williams**' narrow construction of § 1014 prompted Congress to enact § 1344, discussed *supra*, because **Williams** and other cases "`underscored the fact that serious gaps now exist in Federal

The obvious and basic difference between the checks in *Williams* and those here is that the checks in issue were bogus rather than drawn against insufficient funds.[14] We think this difference crucial, however, and precisely what makes Hord's behavior culpable under § 1014. We cannot agree with Hord's conclusion that, like checks drawn on insufficient funds, bogus checks such as the ones he deposited at NBT are not "false statements" under *Williams* and its progeny. Instead, we find this situation more similar to that presented in *United States v. Falcone*, 934 F.2d 1528 (11th Cir.) (per curiam), *reh'g granted & opinion vacated*, 939 F.2d 1455 (11th Cir. 1991), *opinion reinstated on reh'g*, 960 F.2d 988 (11th Cir.) (en banc), *cert. denied*, ___ U.S. ___, 113 S. Ct. 292 (1992). In a case involving the presentation of checks bearing a signature stamp made without authorization, the Eleventh Circuit held that *Williams* did not apply.[15] The court found, rather, that the unauthorized use of the

---

jurisdiction over frauds against banks and other credit institutions....'" S. Rep. No. 98-225, 98th Cong., 2d Sess. 377, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3517, *quoted in United States v. Bonnett*, 877 F.2d 1450, 1454 (10th Cir. 1989).

[14]   We agree with Hord that the use of deposit slips does not alone provide a way to distinguish his case from *Williams*. As Hord points out, the defendant in *Williams* presumably also used a deposit slip to deposit his insufficient funds checks; but, like the *Williams* Court, we are concerned with the checks, not with their deposit slips. *See Williams*, 458 U.S. at 281.

[15]   Although the defendants also had been charged with violations of § 1014, we note that the appeal in *Falcone* was taken from a conviction under former § 1344(a)(2) (for text, *see supra* note 9), for making false representations to a federally-insured bank. *Falcone*, 934 F.2d at 1539. The court in *Falcone*, however, defined "false representations" under § 1344 by referring to *Williams* and its discussion of "false statements" under § 1014. *Id.*

signature stamp constituted an affirmatively false representation that the signatures so made were authorized; and that such use was tantamount to forgery. *Id.* at 1542.

The Eleventh Circuit held, and we agree, that "***Williams*** does not govern a situation in which some information on the check, such as a false signature, or a fictitious bank, is itself a false statement...." *Id.* at 1541 (internal citations omitted) (citing ***Bonnett***, 877 F.2d at 1454 ("massive" scheme to defraud not covered by ***Williams***, despite use of insufficient-funds checks); ***United States v. Worthington***, 822 F.2d 315, 319 (2d Cir.) (fictitious drawee bank a false statement, false representation that bank actually existed), *cert. denied*, 484 U.S. 944 (1987); ***United States v. Price***, 763 F.2d 640 (4th Cir. 1985) (false names, amounts, account numbers, and signatures on credit card slips presented for deposit were false statements); ***Prushinowski v. United States***, 562 F. Supp. 151, 156-58 (S.D.N.Y.) (drafts with unauthorized, illegible or fictitious drawer signatures were false statements), *aff'd mem.*, 742 F.2d 1436 (2d Cir. 1983)).

As ***Falcone*** and the above listed cases cited by it indicate, we are not alone among the federal circuits in applying ***Williams*** narrowly, to "the simple presentation of a check drawn on an account with insufficient funds, without other evidence that the defendant made some false representation to the bank...." ***Falcone***, 954 F.2d at 1540. *See also* ***United States v. Haddock***, 956 F.2d 1534, 1543 (10th Cir.) (altered entries in checkbook in advance of audit were "false statements"), *cert. denied*, ___ U.S. ___, 113 S.

- 20 -

Ct. 88 (1992); *United States v. Swearingen*, 858 F.2d 1555 (11th Cir. 1988) (per curiam), *cert. denied*, 489 U.S. 1083 (1989) (sight drafts representing fictitious sales of automobiles used to obtain credit held violative of § 1014); *United States v. Rafsky*, 803 F.2d 105, 107 (3d Cir. 1986) (scheme to defraud based on numerous insufficient funds checks held violative of § 1344), *cert. denied*, 480 U.S. 931 (1987); *United States v. Glanton*, 707 F.2d 1238 (11th Cir. 1983) (signing false name to signature card and counter check, and in endorsement, held to violate § 1014). As the court in *Price* noted, "there is nothing in *Williams* that equates the passing of checks drawn on accounts with insufficient funds with fraudulently making or altering a document", as Hord did. 763 F.2d at 643 & n.3.

This reading accords with the policy behind *Williams* as well. *Williams*, as the Court intended, has the salutary effect of ensuring that a "broad range of unremarkable conduct", *i.e.*, the relatively commonplace drawing of checks against insufficient funds, is not "a violation of federal law". *Williams*, 458 U.S. at 286. Needless to say, Hord's conduct "does not strike us as similarly unremarkable." *Worthington*, 822 F.2d at 318-19. As the Second Circuit has noted, "[i]nsufficient funding may have a perfectly innocent explanation". *Id.* On the other hand, we cannot conceive of any innocent explanation for presenting bogus checks, not issued by the banks named as drawee, with forged signatures and incorrect routing numbers, and payable to a client whose existence is doubtful at best. We hold that Hord's use of forged signatures,

false drawee bank and payee information, and inaccurate routing and account information on the checks he deposited, constituted "false statements" under § 1014, and is not saved by *Williams'* limitation of that term.

b.

Because the checks in issue contained false statements, we next examine Hord's contention concerning the final element of § 1014 -- whether the government presented sufficient evidence that Hord made these false statements with the purpose of influencing the action of the bank "upon any application, advance, ... commitment, or loan."  18 U.S.C. § 1014.

Hord maintains that the government failed to prove that he acted with the intent to influence the bank to lend its funds or the funds of its depositors.  To the contrary, the government presented Rule 404(b) evidence that Hord previously had succeeded in just such a scheme at other area banks, *see supra* note 4.[16]  At both MBank and Cy-Fair, Hord had successfully withdrawn funds against checks that he had deposited, before the collection process had been completed.

---

[16]    Rule 404(b) provides that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

- 22 -

Hord next asserts that the fact that NBT did not credit his account is evidence that he did not intend to influence the bank. Again, we fail to see the connection between Hord's intent (the crucial factor under the statute), and NBT's action. Obviously, just because NBT did not credit Hord's account does not mean that Hord did not intend for it to do so.[17] Furthermore, the bank's action in response to Hord's attempt to defraud it is irrelevant. It is undisputed that a § 1014 offense is "`a crime of subjective intent that requires neither reliance by the lending institution nor an actual defrauding for its commission.'" *Bowman*, 783 F.2d at 1199 (quoting *United States v. Davis*, 752 F.2d 963, 969 (5th Cir. 1985)); *United States v. Huntress*, 956 F.2d 1309, 1317-18 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 2330 (1993); *Shaid*, 730 F.2d at 232.[18] A rational trier of fact could have found that

---

[17] In fact, we cannot see what else Hord could have intended. By making deposits of the bogus checks, he surely intended that the bank credit his account in the face amounts of the checks. His withdrawal attempts reflect this. And, he must have intended that NBT make the credit *before* the checks cleared through the collection process, *i.e.*, that NBT make him an advance. Once the bank put the checks into the collection system, discovery of the faked routing numbers, etc. was inevitable; and Hord surely would not have been allowed to withdraw funds after the checks were returned to NBT unpaid.

[18] Hord's reliance on *United States v. Krown*, 675 F.2d 46 (2d Cir.), *cert. denied*, 459 U.S. 839 (1982), is misplaced. In *Krown*, the Second Circuit held that the mere deposit of fraudulent instruments, followed by a "bookkeeping entry showing the checks credited" to the account of a third party, did not violate § 1014. *Id.* at 51. We are presented with different facts here.

In *Krown*, the defendant "paid" for purchases from his supplier with certified checks drawn on a fictitious offshore bank. The defendant's intent was only "to have the bank accept the certified checks for deposit and carry out collection procedures". *Id.* As noted, the fictitious bank on which the checks was drawn was

Hord was attempting to influence NBT to advance him funds against the security of the checks he had deposited, before the checks cleared.

Because we conclude that the checks deposited in Hord's account at NBT were false statements, and that Hord's intent was that NBT credit his account pursuant to them, thus making an advance, we affirm his convictions and sentences on counts ten-19 of the indictment.

### III.

For the foregoing reasons, the convictions and sentences are **AFFIRMED** as to counts two-six and ten-19, and **REVERSED** and **VACATED** as to counts one and seven-nine.

**AFFIRMED in Part, REVERSED and VACATED in Part**

---

offshore; after the checks failed to clear through the normal collection process, and pursuant to the defendant's instruction, the collecting bank attempted to collect on the checks by mailing them directly to the bogus bank in the West Indies. *Id.* at 49. The purpose of this scheme was not to induce the bank to make an advance, loan, commitment, etc., but to give the defendant more time to buy goods on credit from the payee of the checks. *Id.* at 50. Indeed, rather than attempting to induce the collecting *bank* to credit the payee's account, the defendant *himself* deposited a legitimate certified check in the payee's account, in order to make it appear that one of the bogus checks had been honored. *Id.* at 49.